You can both participate. I hope your respective health situations are okay now. We're not doing very many Zoom arguments, so we may have forgotten our precise standards, but I do ask you to be sure all of your devices are turned off. We do not want recordings of any sort. This is being sent to audio on YouTube or something like that anyway. This meeting is being recorded by the host or a participant. Got it. I don't know why that came up on my screen. Anyway, and then we will give each of you about six minutes to start off with uninterrupted. Because it's a little awkward when people are asking questions on Zoom. So with that, we will start with Mr. Bail. Thank you, Your Honor. May it please the Court. Ashok Bail for the appellant Dion Montague. Your Honors, we are here because we believe the Honorable District Court got it wrong in granting summary judgment for the appellee, the United States Postal Service, particularly on the issue of whether USPS, who I will refer to United States Postal Service as USPS or the agency throughout this presentation, particularly on the issue of whether USPS failed to reasonably accommodate appellant Montague in violation of the Rehabilitation Act. The ADA and its sister statute, the Rehabilitation Act, is designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities. I would like to start by bringing the Court's attention to a very stark material fact and what amounts to a slap in the face to the purpose of the Rehabilitation Act. USPS admits that at the time giving rise to appellant's claims, the policy was to allow telecommunicating for a maximum of two days per week. And that admission can be found on ROA.84 and ROA.177. The policy basically states that if you're an eligible employee, as appellant was in the capacity of a communications program specialist, you're allowed to telework up to 16 hours per week. Appellant Montague, with a disability, requested to commute two to three hours a day in the mornings up to five times per week. Doing simple math, totaling up to 15 hours per week maximum is what she was requesting as a reasonable accommodation. This request was well within the established policy, even though the Rehabilitation Act provides that an employer can go outside of the established policy when making reasonable accommodation. Indeed, USPS denied Montague's reasonable accommodation request to telecommute up to 15 hours per week, claiming it would be an undue hardship. USPS, by its own admission and policy, found it reasonable for employees to telework up to 16 hours a week, yet at the same time found it unreasonable and an undue hardship for Montague to telecommute up to 15 hours per week. USPS clearly overstepped its bounds and abused its power. Ultimately, what USPS is saying is if you do not have a disability or a non-disabled employee, telework is reasonable and we will allow you to telecommute up to 16 hours. This is not a hardship. However, if you have a disability, we will not allow you to telework up to 15 hours a week because this is simply not reasonable and an undue hardship. Furthermore, presently, USPS communication program specialists, employees with or without disabilities, are being permitted to work outside the 16 hours per week regular policy, working a 40-hour week telework schedule and have done so for the past 24 months. To sum it up, if you are a person with a disability, it's a hardship on USPS to allow you to telecommute in this situation, but if you do not have a disability, it's not a hardship. In fact, considered more efficient, Appellant Montague was only asking for what was already being afforded to her non-disabled co-workers within USPS. Your Honors, this is a unique situation when it comes to a Rehabilitation Act or an ADA claim in that the USPS actually accommodated my client for a 4-6 month period in 2014. During this period that she was being accommodated, she received an excellent evaluation and she also received an award from her supervisor. So, if the USPS is saying it's an undue hardship, at the same time it positively affirmed that she was doing a good job during the period of time that she was being accommodated and that the accommodation was reasonable. We believe that the trial court, the district court level, ignored most of the evidence from the appellant and gave most of the weight to the conclusion after the fact testimony of appellant's supervisor, Ms. Polly Gibbs. Appellant's summary judgment evidence established that the USPS failed to reasonably accommodate appellant. Appellant was provided with a reasonable accommodation of telecommuting for a disability from June 2014 until November 2014, at which time all telecommuting was temporarily stopped due to a cyber attack. After telecommuting was reinstated, the appellant requested to resume the accommodation that was previously provided to her. However, USPS to her manager, Polly Gibbs, manager of corporate communications, denied Montague's request for reasonable accommodations, stating no accommodation was offered because no accommodation existed that would overcome the limitations caused by Ms. Montague's disability. However, Montague attests an accommodation did exist. The evidence reflects that Montague was accommodated with telecommuting from home, the requested accommodation for the same disability and the same limitations in 2014, just five months prior. Montague's accommodation of telecommuting two to three hours in the morning and reporting to her domiciled office by noon was reasonable and it was successfully accomplished as Montague received an excellent performance review and monetary achievement award during the time period she was being accommodated. Evidence, it was effective and reasonable, a very clear dispute. Your Honors, the six minutes is over and if there's questions... Well, yes sir, we are some years away from when Ms. Montague said she was constructively discharged. Is she employed now somewhere? No, Your Honor. Since she took the disability retirement, she's I believe only been receiving income from her retirement, which I think is like 40% or something like that of her income. So she hasn't even attempted to get a job elsewhere? Initially, Your Honor, she did, but at some point she stopped looking. Okay. I guess what concerns me here is, you know, the Postal Service said that they had to discontinue teleworking because of a cybersecurity invasion. And so that seems to me to render irrelevant the fact that she had been allowed to telecommute before that occurred. I do not see the COVID period as a valid exemplar of anything because nothing in the economy was working normally during COVID. And so the way I tear this case down in my own mind is to wonder why it was so difficult for Ms. Montague to think about some version of the accommodation that the Postal Service offered. In other words, one possibility was let your husband drive you to work. Well, she says, I can't do that because I'd have to go too early. Well, she lives less than a half mile from work. Seems to me that arranging for a driver each day for one half mile is not that inappropriate. And she could have walked home at the end of the day because neuropathy does not prevent one from walking. As far as I'm aware, 700 yards, according to what I saw. So what explanation is there in the record for why Ms. Montague rejected both of the any version of those possibilities? Your Honor, in the record, Ms. Montague gave the reason that it was not affordable to her to take up that cost for having the cab pick her up on a daily. Do we have anything in the record about how much it is aside from her say so? No, Your Honor. No, Your Honor. Also, in the record, it's established that the accommodation of working from home two to three hours a morning as needed five days a week was prescribed to her by her doctor. Now, I can tell you I have neuropathic pain as well, have had it since I got paralyzed. And I can tell you that I've been accommodating myself by working from home 95 percent of the time, honestly. And the two to three hours that she would require at home is trying to dealing with the neuropathic pain as opposed to dealing with neuropathic pain or the side effects of a drug at the office location. Although the distance is shorter, the location for accommodating at home is much more accommodating and superior to that of working at home, I mean, doing it at the office. Well, then was the disability because she's not able to, if the disability is simply that she's not able to travel, that is a different thing from a disability because of the pain and the consequences thereof. My understanding is that this record is based on the inability of her to get to work. Is that right? That's how it's been tailored for the briefings, yes. It's been mostly discussed as to and from work. But if you say, well, now, if you're changing the game on us and saying that she's in pain or disabled from her medicine two to three hours for five, up to five times a week, that's an entirely different situation vis-a-vis her qualifications for the job. And it's certainly quite distinct from this two days a week telecommuting that you're talking about as a comparative. May I, Your Honor? Sure. What is in the record is that the doctor, one of the doctors, I don't know which one, if it was Dr. Ferrer or Dr. Wang, did say that she would be having side effects from the medication. I think I believe it says something about dizziness, but definitely side effects. So that is in the record, Your Honor. All right. So then what you're actually asking for, which wasn't at all clear to me, is the ability not to really have to work for two to three hours a day up to five days a week. Actually, respectfully, Your Honor, no. What she's asking for is to be able to, in the mornings, deal with the side effects of medication and have to deal with that at home. It doesn't mean you can't stop working. For example, when I deal with neuropathic pain… I'm not insensitive about neuropathic pain, though I've not had it myself. But we're not here to talk about your subjective problems. We're here to talk about what's in the record for your client. I understood. Just by way of example. I understand, and I appreciate that. But all we've got is a bare record. Understood, Your Honor. And if I may, I'd just go back to what was in the record. She did state that it was the cost. And also, if her husband was to drop her off early and then pick her up late, it would be a very long workday. And I do understand Your Honor's point that perhaps she could walk back home. I guess I'm not a doctor enough to give that kind of a clinical opinion. But I do know that if it was her husband, which was suggested, was her husband to pick her up and then drop her off in the mornings, which would have been impossible on a daily level. I don't want to monopolize your time, is what I was going to say. As much monopoly as you want, Judge. We'll hear more about this from your friend in the adjacent screen. But one of the issues in the district court was the amount of travel that was required in this job. The evidence seems to perhaps cut more than one way. What's your explanation of the relevance of the ability to travel? Yes, Your Honor. We believe, and the record reflects, that the travel was a marginal aspect of the job. The travel records actually show that it's like one or two times a year she actually would fly to a different location. And if we're just talking about travel as terms of flying, she wouldn't have had any issues boarding a plane or taking a cab on that instance. The postal service reimbursing her for a cab fare to the airport. So it wouldn't affect travel. Now, as to driving, on the other hand, she was only limited to driving two or three hours a day in the morning. And that's not even guaranteed every day. It's like as needed. And she could possibly not even, maybe two days out of the week, she did two or three hours. It was as needed. So even if she took the maximum, which would have been 15 hours a week, if she had taken the two or three hours every morning, she still would have been able to do the essential functions of her job, the other essential functions. Although I don't believe driving was essential, she would have been able to drive as well after the periods of limitation. Any other questions? No, ma'am. Okay, well, you've reserved time for rebuttal. So we'll go to Ms. Perry. Thank you, Your Honor. May it please the Court. I am AUSA Katina Haynes Perry, representing the Appellee Defendant United States Postal Service. My contention is that the district court's opinion should be affirmed because the district court was correct in its assessment that the plaintiff has not identified a reasonable accommodation that would allow her to perform the essential functions of her job. Secondly, as the court has already noted, the relevant time to plaintiff's claim should be that at the time she made a reasonable accommodation, not at the time of the pandemic. To address a few points that the plaintiff has raised, although the plaintiff claims that postal service failed to make a reasonable accommodation, part of a reasonable accommodation is that it doesn't cause undue burden. And in this case, the plaintiff fails to rebut evidence from the postal service that it would create undue burden for the postal service to provide the only accommodation the plaintiff has identified for administrative and financial reasons. Financially, the record shows that it would cost upward of $1,000 per event where the plaintiff was required to appear in person. So, the question before the court is not just whether the plaintiff had to appear in the office, but whether she had to appear for on-site events, whether she had to appear for on-camera interviews, which the record supports that she does. Also, administratively, plaintiff fails to address that she was the only CPS assigned to the Houston and Gulf Atlantic districts. She suggested on the record that in instances where she was not available to travel, another CPS could cover her travel. However, that would not only force USPS to incur those costs, but it would also leave the expertise that the plaintiff provided unavailable, and it would leave the CPS assigned to another district unavailable to provide any coverage for any short notice appearances that may be required in their own districts. Further, plaintiff has indicated that it was within US Postal Service to allow telework up to two days per week. That is not addressed, that telework was limited or expanded depending on the circumstances, and that's something that the district court was also correct in acknowledging that roles can evolve as circumstances change. That's evidenced in the record by the cyber intrusion that necessarily limited telework, and of course, the later pandemic. But at the time, as Ms. Gibbs indicated in the record at page 127, it was certainly reasonable for the United States Postal Service to take the position that it took, that there was no accommodation identified that was reasonable and not causing undue burden to the Postal Service. And also for clarification, in addressing the relevant time period, the characterization that CPSs are currently working completely from a remote position is inaccurate. The record does not reflect what is currently being done by CPSs, but it reflects at the time of the witnesses' depositions in this case what was being done. So that is a situation that is continuing to evolve even now. One point that plaintiff raises is that she was provided an accommodation by Ms. Gibbs on an informal basis before the cyber intrusion to be able to work from home as needed. Again, although the Postal Service does not contest that the plaintiff was able to get good performance reviews during that time, that does not negate the additional undue burdens to the Postal Service, and that it was impractical to have someone cover for her on a long-term basis without the Postal Service incurring costs, and as I've already mentioned, those administrative burdens. It is an essential function of a CPS to be able to appear in person as needed, sometimes on short notice, and sometimes on schedules set by the media. The Postal Service did not view this requirement to appear in person as something that was merely inconsequential, but the travel is something that actually occurred, and the U.S. Postal Service actually had to send another CPS to cover travel for the plaintiff while she was unavailable to do so. The characterization that the travel records only show that the plaintiff traveled one or two times per year is also inaccurate because the record shows that not all travel was documented. On the record at page 122 and 450 through 52, Ms. Polly Gibbs explains that if travel was within one's domicile and it was less than 50 miles, that's not an appearance that would be documented within the travel records. So, that's why it's important to focus on not only the job description, but the judgment of the employer as has already been established by Fifth Circuit case law. The plaintiff fails to show that the Postal Service did not have a legitimate business interest in seeing to it that they did not have to incur any undue burden administratively or financially by having someone else cover plaintiff's required travel. And contrary to what plaintiff has asserted, the record shows that she would not be available necessarily to travel to cover someone else's appearances or even her own appearances. And the plaintiff acknowledged that there would be times where she would be incapacitated, and that's revealed in her letter of appeal in the record at page 128. Ms. Perry, I think we've gotten past the six-minute mark. I want to ask you about a couple of things you've already mentioned, travel being primary. You may well be right as to what the best view of the evidence is, but we're here on summary judgment. We have plaintiffs saying not just what a record reflects. Apparently, she actually asserts she traveled once in 2013, twice in 14, whatever, and 15, two or three times. You say the better view of the evidence is what you said a moment ago, but it doesn't sound to me as if there's real evidence of how often she traveled, just that if she traveled within, what, the state or within the district or something, it would not be recorded. Isn't that a fact question that also goes to other fact questions as to perhaps how often she needed some sort of somebody to be sent on her behalf? Is that clear? I'm just worried that perhaps Judge Hughes was a little premature in resolving this on summary judgment. Tell me what I'm missing. Yes, Your Honor. Although it would be a fact question as to how often the plaintiff was required to travel, the plaintiff does not rebut the evidence in the record that her manager could require her to travel, that she in fact traveled, and that the estimate from Ms. Gibbs was that her travel was up to 50% of in-person appearances at 134 to 35. I don't understand what that means. Would you explain that because I've seen that before? What's this 50% point you're making? Yes, Your Honor. That goes to the amount of time that Ms. Gibbs estimated the plaintiff would be required to appear in person, not only for reporting to the office in person, but appearing for events where she would act as a spokesperson and a support person in her role as a CPS. So, for example, there could be stamp unveiling events, promotional events, dog bite awareness campaigns, labor disputes, that type of thing where it would require her not only to have to appear in the office, but have to appear somewhere outside the office. What is the record evidence, if any, about whether her in-person obligations would generally take place in the morning versus the afternoon? I believe the record is silent as to whether those appearances would occur in the morning or the afternoon, Your Honor, other than some of the events were all-day or multiple-day events, such as when Mr. McKinney Boyd attended a dog bite campaign for the plaintiff that was over the course of three days. I want to follow up on Judge Southwick's point, which I tend to share, which is the question here is not whether the plaintiff should win. The question is whether the plaintiff should get to go to trial. And if what you're saying is there's no record evidence, at least at this stage, at the summary judgment stage, about morning versus afternoon obligations, do I understand correctly that what the plaintiff is asking for is to be working from home in the mornings and to work at the office or to appear in person at these events in the afternoon? Do I understand the plaintiff's requested accommodation correctly? I believe so, Your Honor, except for the distinction that we know there are certain events that will be all-day events, so that would encompass the morning periods where the plaintiff has indicated that she's not available to work. And the record also shows that not only is she... I understand that there are record... If I may just be a bit more precise, I understand that there are these events that are all-day. That certainly does not sound surprising. Is there any record evidence that she needed to be at these events as part of her job all day as opposed to being at events in the afternoon? We all go to events or have to go to things where we don't necessarily have to be there the whole day. We can be there for a portion. And so I'm just asking what the record evidence indicates on that point. Your Honor, the record indicates that aside from all-day events, there were occasions where the plaintiff would be required to make an appearance on short notice, such as something that... I'm asking about the all-day events themselves. We can get to the short notice in a moment because that sounds important as well. But you're saying there are all-day events that she needs to staff. Does the record evidence indicate that she has to be at these events throughout their entirety as opposed to being able to be there just for certain afternoon portions? Or is the record silent in that regard? I believe the record is silent in that regard, Your Honor. But part of the issue would be that she was completely unavailable to appear in the mornings. In fact, the record shows that she indicated she could not even get dressed in the morning. Well, this is an issue of reasonable accommodation. And a lot of moving pieces, it seems to me, that it's hard to decide that we... Maybe we do. But one of the decisions is do we know enough right now based on what's settled and how reasonable or unreasonable it would be to accommodate some of what we're talking about. She's only appearance with a lot of people at this all-day event. Her participation only would take two or three hours. Can she be accommodated that two or three hours be in the afternoon as opposed to the morning? I mean, all that's part of a very important statute protecting very sympathetic people. Yeah, but why can't an employer say the public relations specialist for my company has to be available when public relations are needed? In other words, it's the events that determine the job duties. It's not the employee. I guess that's for you, Miss Perry. Yes, Your Honor. Yes, Your Honor. Certainly, the issue for the Postal Service in terms of its needs are some of these involve not only internal communications, but external communications. So the need for the in-person appearance is not dependent necessarily on what the USPS controls, but some of its clientele. And that's the issue in this case. How do you reconcile that with this testimony? I understand that 248 of the record, that you've got one person in the same job category that worked remotely for 19 years. Is that in reference to Mr. Molonton? I believe it's a communications program specialist who apparently served at the Postal Service from 1995 to 2014. And at least the testimony is that the duties were largely remote. The affiant is Steven Seawoster at that page. Yes, Your Honor. The testimony provided by Mr. Seawoster does not cover an assignment to the Houston district. And the record shows that each district was unique and plaintiff was the only one to cover the Houston and Gulf Atlantic districts. And also, Mr. Seawoster does not indicate that he ever worked from home. So it's not a comparable analysis. It also doesn't cover the period before, I'm sorry, after the cyber. What does that mean working from home versus working remotely? At the end of the day, does it really matter to the Postal Service whether they work from home or from a Starbucks? No, Your Honor. It depends, however, on the district assignment. So that's the distinguishing factor for Mr. Seawoster in the plaintiff in this case. You specifically mentioned home versus, well, anyway, you also have this testimony from a district manager. I believe this is at 252. That is specifically about Montague, as I understand it, that she was able to do her job either from office or from home. So that's not about a different district, as I understand it. That's about her district and about her personal employment specifically. Yes, Your Honor. The issue, however, with Mr. Melanson's statement is that it's only relevant to October 2014, which is the period before the cyber intrusion. And it only addresses plaintiff's performance, does not address the additional burden. I don't understand the cyber intrusion point because I would think that, I mean, perhaps I'm mistaken about technology. But the progress of technology would suggest that things should be easier to get done today rather than harder. I mean, is your point that you can work from home before 2014, but in 2022, that's just crazy? No, we're talking about 2017, aren't we, ma'am? Yes, Your Honor. My point in raising the cyber intrusion issue is just as it applies to the relevant time of when plaintiff made her reasonable accommodation request, which was after the cyber intrusion. Pardon me, but I should be better about this. What is the time period that we're talking about in this case? She stopped working in 2017. She went through the administrative process for about three years. OK, and so you're saying hypothetically today somebody could work from home, but in 2017, there was a temporary difficulty due to a cyber intrusion event in 2014? No, Your Honor. The question of whether a CPS could work from home just depends on the circumstances at the time is the only point I was raising with the cyber intrusion. Even today, the Postal Service would have to analyze whether the plaintiff could perform the essential functions with her requested accommodation. The other issue with Mulan Song's statement is that it doesn't address the additional burdens to the rest of the plaintiff's team that Ms. Gibbs amplified in her statement. So, it doesn't address the administrative and the financial issues that it caused to have other CPS's cover for the plaintiff. I mean, doesn't the plaintiff have the burden of proving that the Postal Service's request for accommodation was unreasonable? Yes, Your Honor. So, you would think that the plaintiff might have the burden to say that having a driver, it could have been a high school student, take her half a mile to the office in the morning, you know, whether that was cost effective or not. I mean, in other words, if there's a question of fact there, it seems to me it was the plaintiff's burden. Yes, Your Honor. It's the plaintiff's burden. The plaintiff has presented no evidence of the actual cost of what it would cost her to have a third party provide their transportation. And she's presented no evidence to rebut the evidence presented by the Postal Service of the burdens that it would cause to the Postal Service. You don't deny that that would be a cost, right? To have two drives back and forth every day for every work day, it's obviously going to add up. Yes, Your Honor. It could be a cost. I suppose your real argument would be that it's not an unreasonable thing to make her do, but I mean, there's, it's kind of hard to dispute that there's going to be a monetary, I'm just, you know, what, five to ten dollars of Uber, times two, right, every single day. It seems to me that's going to add up. Yes, Your Honor. If a third party commercial service were to provide transportation, that would certainly incur a cost. That's not necessarily the only method that she could use to get to work by a third party. So there could be some additional, you know, service at no cost. But certainly the plaintiff has not presented any evidence to what that cost would be in this case and has not rebutted evidence of the expenses to the Postal Service. There was no medical evidence that she was unable to walk home 700 yards, was there? Not for the afternoon, no, Your Honor. Right. I'm not sure, I think your position is constructive discharge isn't really in this case. Would you give us a little time you have left, what we should do with constructive discharges, an issue it is at least in the briefing? Yes, Your Honor. I acknowledge there's a split in the circuit of whether or not that is a prerequisite requirement. So I will defer to the court on whether or not because the plaintiff has not shown that she actually exhausted the constructive discharge claim, that that's something that should proceed in this case. However, if the court decides to remand to the district court, that's an issue that can be taken up by the district court to allow the plaintiff the opportunity to show that she actually exhausted because the record as it currently exists only shows that she raised the one claim of the disability discrimination. What is the record evidence that the, as I understand it, November 2014 was when the cyber intrusion took place? Yes, Your Honor. That it had an effect three years later? Your Honor, for clarification, I'm not alleging that the cyber intrusion had an effect three years later. I only raised the cyber intrusion issue as to the point of circumstances may change and evolve that may expand or restrict total work. Okay, if you understand my skepticism, or at least my question, if not skepticism, is you've got a cyber intrusion in November 2014. Cyber intrusions, regrettably, happen to businesses across the country every day. They, I assume, don't paralyze the operations for an indefinite period of time. The business gets back to work. They're able to restore cyber functions. So, I'm just not seeing, and I'm asking the record evidence to support the inference that because there was a cyber intrusion in November 2014, work from home was infeasible and an unreasonable accommodation in 2017. You may have a case for that. I just want to understand what that evidence is. Your Honor, the only case I would have to support is that... So, when I say case, I mean evidence. Just what record evidence do you have? If any, if you don't have any, that's fine. But what record evidence is there, if any, to support the notion that the November 2014 cyber intrusion is somehow relevant to whether she could work from home in 2017? I think it's only relevant to the extent of the total work, not necessarily to the reasonable accommodation request, if that makes sense. So, the policies in terms of the change in circumstance for when total work is available. Does that answer your question, Your Honor? Thank you. Thank you. All right, Mr. Bail, you have rebuttal time. Yeah, you, Kim, Paula, yeah, there you go. Thank you, Your Honors. I'd like to address a few points brought up by... I apologize. Apologies for interrupting you before you get started, but I do want to clarify something that I think it was the questioning between you and Judge Jones. I think Judge Jones had a good point that the policy of two days, because I checked the record just a moment ago, that the policy is two days, not 16 hours. Is that right? Yes, it's classified as two days. I took the liberty of adding eight hours a day to make it 16 hours. Okay. It's a bit slippery on your part. It's not... I don't think the U.S. Postal Service was saying you can give me up the hours however you see fit. This is technically telecommunicating for five days a week, what you're asking for. In the mornings as needed until her condition stabilized. I'm not saying you're right or wrong or deserve trial or not. Just to be clear, I don't think it's fair to say that the two-day policy can somehow be invoked to support a five-day policy. Anyway, go ahead. I'm sorry. That's okay. I understand your point, Your Honor. What I wanted to just piggyback on or just add to the discussion about the cost hypotheticals. Hypothetically, the United States Postal Service could have very easily agreed at the point where my client said she could not afford the cost. They could have hypothetically came back in the interactive process and agreed to pay the cost for a reasonable period of time. Because my client and her doctors have alleged that her period of requiring as needed in the mornings was only temporary until her condition stabilized. So hypothetically, the Postal Service could have continued the reasonable accommodation process and agreed to pay the cost. But Mr. Bail, according to you, apparently her condition has never stabilized. That's not what I said, Your Honor. Well, you said she's on disability and she looked for work for a while and she has stopped looking. At least during the period she was employed, it didn't stabilize for some years. Right. I can't speak to the medical evidence as that's not in the record. But, Your Honor, I can definitely tell you during the period of time that she was requesting that accommodation, her doctors were requesting that it be in the mornings until her condition stabilized as needed. And it was never intended to be every single day. It's just as needed up to 15 hours for that week, Your Honor. When the Postal Service says that she was completely unavailable in the mornings, that's also incorrect. It just depends on the morning. I mean, one morning she may not have the issues. Another morning she may. Until her condition stabilized, she just wanted the mornings. Was there a record already of the months leading up to the request of how often she was not available? She requested up to five days just in the mornings, but there would have been some history in the weeks, months before that. Is that in the record? Was she needing to be out every day and couldn't because she hadn't been accommodated yet or just what's there? Yeah, that's actually not in the record. What is in the record is that during that period of time, her supervisor said she testified at her deposition that she really didn't know how my client was appearing at meetings and such. What is in evidence is actually the testimony of, I believe Honorable Judge Ho mentioned the Houston District Manager who testified that there was no difference her working remotely at her home office than the physical client for station, which, as your honor Jones indicated, was 700 feet or yards away. Yeah. Yeah. 700 yards away. In closing, your honor, I want to thank the Fifth Circuit Court of Appeals. I apologize. Could you briefly address Judge Jones's question about the fact that she happens to live, I guess, by happy coincidence, not that far from the office? Why couldn't she just walk? Yes, your honor. So because of her neuropathy is in her feet, it's excruciating for her to walk during periods of the neuropathy. So that's why. Yeah, but if she takes medicine in the morning, it gets better. Isn't that the whole point? So Judge Ho, it is in the record. And your honor, can you please tell me your question again? I said the whole point of her staying at home in the morning is to take the medicine which relieves the neuropathic pain and has whatever side effect so that she can go into the office and do her job, which presumably means she is not disabled from walking home in the afternoon. Presumably, again, I'm not a doctor, so I couldn't get that question. But there's no evidence to the contrary. I mean, that's the whole point of the medication is that it takes effect in the morning. You know, another possibility would be that she could get up earlier in the morning and take it, but that's not in the record either. But excuse me, Judge Ho, did you have another question? No, thank you. Did you have anything more, Mr. Bail? No, honestly, I just wanted to thank the court for actually allowing me to come. I don't know if you set up the Zoom to accommodate me. I don't know. But all I can tell you, your honors, it's a huge difference being able to do this by Zoom rather than having to travel, which I was prepared to do after I saw my doctor. But I can't tell you how much gratitude I have to the court. Well, as it turned out, there was good reason to accommodate both you and Ms. Perry, who has a baby coming. So we're happy. We're happy we could do that. Thank you. All right. Thank you. Goodbye.